[Civ. No. 7100.   First Appellate District, Division Two.—December 16, 1929.]

JAMES GULLEY, Respondent, v. TRADERS OIL CORPO-
RATION, Appellant.

Adams, Adams & Binford and John Q. Adams for Appellant.

E. A. Klein for Respondent.

BURROUGHS, J., *pro tem.*—The plaintiff brought this action to recover damages for personal injuries alleged to have been suffered by him through the negligence of the defendant. The case was tried by the court without a jury and judgment entered in favor of the plaintiff, and from said judgment the defendant appeals.

Appellant contends that the findings and judgment are not supported by the evidence in two particulars: First, that at the time and place of the accident that caused the plaintiff's injuries the latter was a licensee, and not an invitee upon the property of the defendant, and, therefore, the defendant owed him no duty other than to refrain from committing a wilful or wanton injury to him. Second, that the equipment, appliances and methods in use by the defendant in carrying on its business were, at the time of the accident, the same as generally used by others in the same business in that locality; that the cause of the accident was a defective iron rod; that said defect in the rod could not, by any amount of diligence or care on the part of the defendant have been anticipated, guarded against or prevented.

Bearing in mind the well-established principle of law that courts of appeal will not interfere where a finding of fact is based upon conflicting evidence, the evidence in support of the findings of the court shows that on January 10, 1926, and for some time prior thereto, the defendant was engaged in the business of operating oil-wells in the Kern River oil-fields, in Kern County; that it was the owner of a piece of property called "The Rambler Oil Lease," on which there were a number of oil-wells; that on the day last mentioned

the plaintiff was riding in an automobile on a road on the said "Rambler Oil Lease," and that a cable used in the operation of one of defendant's oil-wells broke away from its supports and struck the automobile in which the plaintiff was riding; that as a result thereof the automobile was damaged and the plaintiff suffered personal injuries, both of which injuries are the basis of this action. The evidence further shows that at the time of the accident the plaintiff was on his way to visit a brother, who, though not employed by the defendant, lived in a house on the "Rambler Oil Lease" as the defendant's tenant; that the road was generally used and was the most direct road to the brother's house from the direction plaintiff was traveling; that there were other residences near the house in which the brother lived, and tradesmen, mail carriers and visitors, and, in fact, anyone desiring to do so, had used this road for a number of years before the accident; that there were no signs or marks to indicate that it was claimed as a private road. The defendant introduced evidence to the effect that a road to the east of the one upon which the plaintiff was traveling was the public road and also the most direct road to the house occupied by the plaintiff's brother, but such evidence merely raised a conflict and the court was not bound to accept it.

Without detailing any more of the evidence on this phase of the case, we are satisfied that the authorities bear out the conclusion of the trial court that the plaintiff was not a licensee upon the premises, but an invitee.

In volume 15, Cal. Jur., page 741, it is said: "Where a building is let in flats or offices, the hallways, entrances and stairways not being demised to the tenants, but used in common by all, the landlord owes a duty to those visiting the premises and entering such passageways to visit a tenant, . . . as they are invitees of both landlord and tenant." We think that this language applies to the facts of the case at bar. The plaintiff was on his way to visit his brother, who was a tenant of the defendant, and the inference from the testimony is clear that the defendant retained the right of way to the house of the brother of plaintiff, and it was therefore its duty to see that the road was kept in a safe condition for travel. In *Brown* v. *Pepperdine,* 53 Cal. App. 334 [200 Pac. 36, 37], in passing upon the sufficiency of a complaint

dealing with the distinction between a licensee and an invitee, the court used the following language: "We are of the opinion that the plaintiff while using the common entrance to the basement to transact business with the tenant of the defendants was an invitee of both the tenant and the defendants; and that having been injured while he was such an invitee the complaint states a cause of action against the defendants."

In *Grant* v. *Sunset Telephone etc. Co.*, 7 Cal. App. 267, the court, at page 273 [94 Pac. 368, 370], quoted approvingly from *Sweeney* v. *Old Colony etc. R. R. Co.*, 10 Allen (Mass.), 368 [87 Am. Dec. 644] : "The general rule or principle applicable to this class of cases is, that an owner or occupant is bound to keep his premises in a safe and suitable condition for those who come upon and pass over them, using due care, if he has held out any invitation, allurement or inducement, either express or implied, by which they have been led to enter thereon. . . . The gist of the liability consists in the fact that the person injured did not act merely from his own convenience and pleasure, but from motives to which no act or sign of the owner or occupant contributed, but that he entered the premises because he was led to believe that they were intended to be used by visitors or passengers, and such use was not only acquiesced in by the owner or person in possession and control of the premises, but that it was in accordance with the intention and design with which the way or place was adapted and prepared or allowed to be so used."

The following language, taken from *Phillips* v. *Library of Burlington*, 55 N. J. L. 307 [27 Atl. 478], is quoted with approval in *Grant* v. *Sunset Telephone etc. Co., supra:* "A person entering premises of right or by invitation, expressed or implied, and using a path which for many years had been used with the acquiescence of the owner is not precluded from recovering damages for an injury caused by a danger placed by the owner across the path, solely on the ground that the owner had provided another way that was safe and might have been used by the plaintiff. In such a case it is a question of fact whether the path taken by the plaintiff has, by its accustomed use, with the knowledge of the defendant, become a way which by its

.use and appearance indicated a way that persons so using the premises were invited to use.''

Counsel for appellant has cited authorities in support of his contention that the respondent was a licensee upon the property, and not an invitee. We are satisfied that, under the statement of evidence above set forth, such authorities are not in point, and that the plaintiff was not a licensee, but an invitee upon the premises of the defendant at the time of the accident.

We next consider the claim that the accident was proximately caused by the breaking of the wrought-iron ''hold-down rod,'' which could not, by any amount of diligence or care on the part of the defendant, have been anticipated, guarded against or prevented, and that the method used by the defendant was the same as is customarily used for similar purposes in the locality of the defendant's lease. On this phase of· the case the evidence discloses that, in pumping oil from the wells, the pumps were operated from a central power plant connected with the wells by cables. A number of cables crossed the road over which the plaintiff traveled at the time of the accident. These cables were suspended from posts set in the ground. Attached to each post was an iron rod seven-eighths of an inch in diameter and about three and a half or four feet long. The rod was attached to the top of the post by an eye-bolt. The lower end of the rod was a hook, and the cable was suspended in this hook. There was also driven in the ground an iron pipe called a ''dead man,'' which was attached to the rod above described by a cable, and held the rod in place and thus steadied the cable that runs from the power plant to the well and kept it from coming out of the hook. Shortly before the accident one of these rods broke and allowed the cable to swing up and down across the road, and, when plaintiff reached this place, his car was struck by the cable and the injuries complained of resulted.

The court received evidence offered by the defendant to show that this method used to hold the cable in place was in general use by oil operators in that locality, and further evidence to show that the breaking of the ''hold-down rod'' was due ·to crystallization or fatigue of the metal in the rod, and that it could not have been detected except by

the breaking of the rod itself. However, Albert Lucas, a witness for the plaintiff, testified that he had worked in and about the oil-fields and in the locality of the "Rambler Oil Lease" for many years, and that at the time of the accident he was working for the defendant; further, he was familiar with the various methods used to suspend the cables in that vicinity, and that there was in general use throughout that district an additional appliance; that in case of the breaking of the "hold-down rod" the cable could not come down. That since said accident that method has been used by the defendant. This witness further testified that it was not unusual for hold-down rods to break. In the light of the evidence of this witness the court was justified in holding that the defendant did not use ordinary care in protecting the traveling public from the danger attendant upon the method in use by it. ▆▆▆ It also appears that even though the accident was caused by the crystallization or fatigue of the hold-down rod itself, and that it could not have been detected, the defendant was in duty bound to use every reasonable precaution to protect invitees upon the premises—such a method, for instance, as testified to by the witness Lucas.

In *Phillips* v. *Pickwick Stages,* 85 Cal. App. 571 [259 Pac. 968, 969] the answer alleged "that the accident was unavoidable by reason of the fact that the brake foot-pedal suddenly broke while being used to stop said stage at the time and place of the accident, and that the breaking of said brake foot pedal was caused by a latent defect in said brake foot pedal which was unknown to defendant under constant use and careful inspection." It is further said in the opinion that the question of the latent defect in the brake foot pedal was a question of fact for the jury, and, further, "the auto stage in question, as is universally the custom today, was equipped with two sets of brakes, that is, the customary foot-brakes operated by means of a foot pedal and a so-called emergency brake operated by means of a hand lever. Upon the breaking of the foot pedal it was not possible to operate the foot-brake, and according to the testimony of the driver of the auto stage the emergency brake was not adequate at the time to stop the car, due to it not being in 'prime condition.' It is apparent that if the emergency brake had been in prime

condition the auto stage could have been brought to a stop and the accident avoided.''

In the instant case, had the defendant used the system to hold up the cable which was testified to by Lucas as being generally used in that locality, it is only reasonable to believe that the accident would not have occurred. So far as the inspection of the various ''hold-down rods'' are concerned, it appears that on the day previous to the accident employees of the defendant passed over the lease to ascertain if the cables thereon were in place. This, however, could not be held to be an inspection of the ''hold-down rod.'' Indeed, under the theory of appellant, such an inspection would not have revealed any defect in the rod.

No good reason has been shown why the judgment should be disturbed, and it is therefore affirmed.

Nourse, J., and Koford, P. J., concurred.